STATE OF NORTH CAROLINA v. ARTIBA DETROY HARRISON

No. 542A90

(Filed 2 May 1991)

1. **Criminal Law § 89.5 (NCI3d)— murder—prior statement of witness—admissible**

    The trial court did not err in a homicide prosecution by admitting the out-of-court statement of the witness Leslie Miller to police where the accounts of the shooting in the out-of-court statement and at trial were substantially the same, notwithstanding minor inconsistencies, so that the statement tended to strengthen and add credibility to the witness's trial testimony. The mere fact that a prior statement contains additional facts is not sufficient grounds to exclude the statement. The differences in the testimony were not prejudicial.

    **Am Jur 2d, Evidence §§ 1148 et seq.**

    **Use or admissibility of prior inconsistent statements of witness as substantive evidence of facts to which they relate in criminal case—modern state cases. 30 ALR4th 414.**

2. **Criminal Law § 89.4 (NCI3d)— murder—prior inconsistent statement—admission not prejudicial**

    There was no prejudicial error in a homicide prosecution in the admission of the out-of-court statement of the witness Frazier to a policeman where defendant did not object at trial, so that plain error analysis applies; the statement differed from and went considerably beyond Frazier's in-court testimony; the in-court testimony of the witness Reid established the same facts as Frazier's out-of-court statement; and Reid's

STATE v. HARRISON

[328 N.C. 678 (1991)]

testimony undermined defendant's self-defense theory as much or more than Frazier's statement.

**Am Jur 2d, Evidence §§ 1148 et seq.**

**Use or admissibility of prior inconsistent statements of witness as substantive evidence of facts to which they relate in criminal case — modern state cases. 30 ALR4th 414.**

3. **Criminal Law § 830 (NCI4th) — murder — accomplice instruction — refused**

The trial court did not err in a homicide prosecution by refusing to give a requested instruction on accomplice testimony where the evidence was insufficient to support the instruction and an instruction given adequately informed the jury that it could give heightened scrutiny to the testimony of Reid and Frazier, the alleged accomplices.

**Am Jur 2d, Trial §§ 589, 592.**

APPEAL by defendant pursuant to N.C.G.S. § 7A-27(a) from a judgment imposing a sentence of life imprisonment entered by *Downs, J.,* at the 14 May 1990 session of Superior Court, MECKLENBURG County. Calendared for argument in the Supreme Court 8 April 1991; decided on the briefs without oral argument pursuant to N.C.R. App. P. 30(d).

*Lacy H. Thornburg, Attorney General, by G. Lawrence Reeves, Jr., Assistant Attorney General, for the State.*

*Malcolm Ray Hunter, Appellate Defender, by Constance H. Everhart, Assistant Appellate Defender, for defendant appellant.*

WHICHARD, Justice.

Defendant was indicted for the first-degree murder of Tony Lamont Jackson. He pled not guilty and was tried noncapitally. The jury returned a verdict of guilty of first-degree murder. The trial court sentenced defendant to life imprisonment, and defendant appealed. For the reasons stated herein, we find no error.

The State's evidence tended to show that defendant, who was called "Detroit," and Antonio "Tonio" Frazier were repairing a house and moving furniture on the afternoon of 17 October 1989. Defendant's brown knapsack containing his black waist bag was

near the front door or on the front porch of the house in which the men were working. The waist bag contained some personal items. While the men were working, the victim sat on the porch, and David "Twin" Reid, Frazier's friend, came out of the alley. Frazier and Reid were talking when defendant asked them to join him and the victim in looking for "some dude with some shades" who had taken drugs from defendant's bag. The four drove in a beige car to Pamlico Street, where the victim said the person with "shades" lived.

Defendant stopped the car, got out, pointed a silver-colored pistol at the victim, and told him to get out of the car. Reid and Frazier also got out and stood by the car. The victim and defendant walked into the bushes, and defendant continued to ask the victim, "Where [is] my stuff at?" The victim denied knowing what defendant was talking about, then denied taking defendant's "stuff." Defendant was holding the gun by his side at this time. Frazier testified that defendant said, "Tell [the victim] I'm not going to do nothing to him." The victim and defendant began to scuffle, and Frazier ran to grab the gun when it dropped to the ground. Frazier said he would not shoot the victim and suggested that the victim tell defendant who took the possessions in the bag. Reid testified that Frazier said, "I shoot him. I shoot him." Frazier then gave the gun back to defendant and returned to stand by the car.

Reid testified that defendant then pointed the gun at the victim a second time and continued asking where defendant's "stuff" was. When the victim turned to run, defendant fired a shot. Reid and Frazier ran, hearing three or four additional shots as they fled. Frazier testified that prior to the shooting the victim put his hands down by his pockets and took a step away from defendant.

The victim died from gunshot wounds to the head and chest. An autopsy produced no evidence that the wounds were inflicted at close range. The medical examiner described the victim's wounds as follows, while pointing to the locations on the prosecuting attorney's back: "The gunshot wound to the shoulder was at the top of the shoulder close to the left base of the neck right about here. And the gunshot wound to the head was on the right posterior scalp approximately here." The examiner later described the gunshot entry points as "on the right posterior scalp" and "over the left shoulder." The left shoulder entry wound "proceeded toward the center of the body toward the heart area and caused injury

STATE v. HARRISON

[328 N.C. 678 (1991)]

to the left lung and the esophagus . . . and to the pulmonary vein on the right, which is a large vein adjacent to the heart draining blood into the heart."

Leslie Miller testified that the evening after the shooting defendant told her he had shot a person named Tony. Defendant informed Miller that Tony yelled "[d]on't shoot!" before defendant shot him. Defendant showed Miller a silver pistol but told her he had thrown away or buried the weapon with which he shot the victim.

Defendant's evidence tended to show that the victim asked defendant for money, and defendant refused to give it to him. Later, defendant noticed that his backpack was open and his black waist bag containing a gold cable chain and medallion and some money was missing. The victim said a person with "shades" had been in the area and had taken the bag. Defendant testified that he realized the victim was lying to him when the four men arrived at Pamlico Street. During the discussion, defendant told the victim: "I ain't going to shoot you, man. I don't know what you're worried about. I ain't going to shoot you." Defendant testified that when the victim turned away from him, defendant saw the victim reaching for something chrome colored. Thinking the victim was reaching for a pistol, defendant shot him. Defendant put the small pistol he saw on the ground by the victim in defendant's pocket. He then left. On his way home, defendant threw his own gun in a creek. Defendant denied discussing the incident with Miller.

[1] Defendant assigns as error the admission of Leslie Miller's statement to the police on 19 October 1989, and Frazier's statement to the police on 22 October 1989. He contends the statements, which were admitted for corroboration, should have been excluded because they did not corroborate Miller's and Frazier's in-court testimony and because they presented unduly prejudicial evidence.

A witness's prior consistent statements may be admitted to corroborate the witness's courtroom testimony. *State v. Holden*, 321 N.C. 125, 143, 362 S.E.2d 513, 526 (1987), *cert. denied*, 486 U.S. 1061, 100 L. Ed. 2d 935 (1988). "Corroborative testimony is testimony which tends to strengthen, confirm, or make more certain the testimony of another witness." *State v. Rogers*, 299 N.C. 597, 601, 264 S.E.2d 89, 92 (1980). Prior statements admitted for corroborative purposes are not to be received as substantive evidence. *State v. Stills*, 310 N.C. 410, 415, 312 S.E.2d 443, 447 (1984). "[I]f

the previous statements offered in corroboration are generally consistent with the witness' testimony, slight variations between them will not render the statements inadmissible. Such variations affect only the credibility of the evidence which is always for the jury." *State v. Brooks*, 260 N.C. 186, 189, 132 S.E.2d 354, 357 (1963); *see also State v. Adcock*, 310 N.C. 1, 17, 310 S.E.2d 587, 597 (1984); *State v. Corbett*, 307 N.C. 169, 181, 297 S.E.2d 553, 561 (1982). *Brooks* imposes a "threshold test of substantial similarity." *State v. Rogers*, 299 N.C. at 601, 264 S.E.2d at 92. In a noncapital case, where portions of a statement corroborate and other portions are incompetent because they do not corroborate, the defendant must specifically object to the incompetent portions. *Brooks*, 260 N.C. at 189, 132 S.E.2d at 357. *Cf. State v. Warren*, 289 N.C. 551, 558, 223 S.E.2d 317, 322 (1976) (capital case in which Court noted the error *ex mero motu* and awarded a new trial).

In some cases, this Court has found error in the admission of statements when the content went far beyond the witness's in-court testimony. For example, in *State v. Warren*, a witness testified that the defendant told the witness the defendant and another man had decided to rob the victim and the two were armed with a knife and a board. The trial court admitted as corroborating evidence an SBI agent's testimony regarding the witness's prior statement to the agent. In the prior statement, the witness said the defendant planned to rob and kill the victim and to kill another man. This Court held that to admit the prior statement was error because the statement went far beyond the testimony at trial, disclosing who struck each blow, the existence of a plan to kill another, and evidence of premeditation and deliberation. *Warren*, 289 N.C. at 556-58, 223 S.E.2d at 320-22.

Similarly, where a witness testified that she did not know how the fire in a house started, the trial court erred in admitting the witness's prior statement that defendant started the fire. *State v. Moore*, 300 N.C. 694, 268 S.E.2d 196 (1980). In *State v. Stills*, 310 N.C. 410, 312 S.E.2d 443, the Court held that a prior statement that the victim had "suck[ed]" defendant was inconsistent with and noncorroborative of testimony that the victim had "fondled" defendant.

However, a statement that merely contains additional facts is not automatically barred. For example, the trial court properly admitted a victim's prior statement of previous sexual abuse, even

STATE v. HARRISON

[328 N.C. 678 (1991)]

though the statement contained facts in addition to those to which the victim testified, because the statement "tended to strengthen and add credibility to [the victim's] trial testimony." *State v. Ramey*, 318 N.C. 457, 470, 349 S.E.2d 566, 574 (1986).

Also, in *State v. Rogers*, 299 N.C. 597, 264 S.E.2d 89, a witness testified that he saw defendant pull the victim out of a car, heard someone say "don't throw that boy in that cold-ass water," and heard a splash. The witness testified that darkness prevented him from seeing what happened when the defendant and the victim were outside the car. This Court held that the trial court did not err in admitting the witness's prior statement to a detective that the witness saw defendant throw the victim off the bridge. The Court reasoned:

> A careful comparison of the testimony of the detective with that offered by the witness Moore indicates that the two are *substantially the same account* of the activities which occurred . . . . This same analysis clearly shows that the [detective's] testimony . . . goes beyond that of Moore in one important respect: At no time did Moore testify that he actually saw defendant throw [the victim] over the side of the bridge. However, the clear implication of Moore's testimony is that defendant did precisely that act. *That Moore did not mention one act which was clearly a component of a series of interrelated acts does not in any way serve to abridge the probative force of the rest of his testimony.*

*Id.* at 601, 264 S.E.2d at 92 (emphasis added).

Here, Miller's statement recounted her conversation with defendant the evening after the shooting. According to Miller's statement, defendant shot the victim in the back when the victim "would not tell him nothing." Miller's account of the conversation made no mention of the victim reaching for a chrome-colored object. Miller told the police:

> Tony [the victim] tried to fight [the defendant] and gave him a hassel [sic]. Tony would not tell him nothing, Detroit said he shot the guy one time in the back. Antonio [Frazier] said let me burn him man, Detroit told Antonio no. Twin, David [Reid] kept begging him not to kill Tony.
>
> This is when Detroit said he shot Tony again in the back and David and Antonio ran. Then he said he shot him in the

head. He didn't say where in the head but he said he blew his brains out.

. . . .

Detroit was there trying to make me scared . . . .

. . . .

[Detroit] has tried to talk to me within the last month. I made him leave cause he made me afraid, I couldn't sleep this morning . . . .

At trial, defendant objected to introduction of Miller's statement, but the trial court overruled the objection and instructed the jury to consider the statement for corroborative purposes only.

The trial court did not err in admitting the statement for corroborative purposes because, notwithstanding the minor inconsistencies between the prior statement and Miller's testimony at trial, the accounts of the shooting were substantially the same. Thus, the statements tended to strengthen and add credibility to Miller's trial testimony.

Further, as noted above, the mere fact that a prior statement contains additional facts is not sufficient grounds to exclude the statement. Here, Miller's prior statement differed from her trial testimony on three points: (1) her statement was that Reid pled for the victim's life; at trial, she testified that the victim pled for his life; (2) her statement indicated that defendant identified the lost item as "dope"; at trial, she testified that she did not know what was taken; (3) the statement included the number and location of the shots; at trial, she said defendant did not tell her this information. Except for the statements that the shots were to the back, these minor inconsistencies are the type of "slight variations" contemplated by the Court in *Brooks* which do not render the statements inadmissible; they affect the credibility, not the admissibility, of the evidence. *State v. Brooks*, 260 N.C. at 189, 132 S.E.2d at 357. Additionally, the information germane to the differences noted above was not unduly prejudicial. Whether it was Reid or the victim who pled for the victim's life is irrelevant to defendant's self-defense theory, which was his sole defense. That the missing possession in question was drugs rather than unknown likewise has no bearing on a self-defense theory. This information,

too, was before the jury as substantive evidence through Reid's testimony.

The statements that the shots were to the victim's back were relevant to defendant's self-defense theory and thus constituted a material inconsistency. It was undisputed that defendant shot the victim, however, and it was equally undisputed that the victim's wounds were rear entry. The medical examiner, without objection, described the wounds by pointing to locations on the prosecuting attorney's back. He described the head wound as "on the right posterior scalp." He described the shoulder wound as "close to the left base of the neck" and accounted for the path of the bullet in a manner that could only describe a rear entry wound. In light of this uncontroverted medical evidence, Miller's description in her prior statement of the locale of the shots could not have prejudiced defendant.

[2]  As to the admission of Frazier's out-of-court statement, defendant did not object when a policeman read the statement to the jury; thus, plain error analysis applies. *State v. Walker*, 316 N.C. 33, 38, 340 S.E.2d 80, 83 (1986); N.C.R. App. P. 10(c)(4) (1990). "Before deciding that an error by the trial court amounts to 'plain error,' the appellate court must be convinced that absent the error the jury probably would have reached a different verdict." *State v. Walker*, 316 N.C. at 39, 340 S.E.2d at 83.

Frazier's prior statement included the following account:

I got the gun and was going to throw it but didn't. Detroit [*i.e.*, defendant] got up and then Tony [*i.e.*, the victim] got up. Tony kept on saying, "Don't do it. Don't do it." I gave the gun back to Detroit; and he said, "I'm not going to shoot you."

Tony turned away from Detroit and tried to run. Detroit pointed the gun at Tony and shot one time. I heard Tony holler, "Oh!" and then saw Tony on his knees crawling behind a tree. I saw Detroit run over to Tony and shoot him again. I started to run and heard a third shot but didn't see Detroit shoot him this time. Twin [*i.e.*, Reid] and I ran, and I fell two times. I saw Detroit go back to the car as I was running.

At trial, Frazier testified regarding the events after he returned the gun to defendant:

Q: What, if anything, did Detroit do with the gun at that point?

A: Well, when I gave it back to him, they started talking again; and then I moved away from them and stood beside Twin again.

Q: At some point did Tony run?

A: Well, when I looked back over there again—me and Twin was saying something to each other. When I looked back over there, Tony had dropped like this and turned around. And then I heard a shot and I looked and then he was hollering and I ran.

. . . .

Q: . . . [W]here was Tony when you saw the defendant pointing the gun after the shot?

A: He was still by the same spot, but he had moved. He had took about a couple of steps . . . .

Frazier's statement differs from and goes considerably beyond his in-court testimony. In so doing, it undermines defendant's self-defense theory. Thus, to admit the statement was error. However, the error is not such that the jury probably would have reached a different result had the evidence been excluded because Reid's testimony was substantially similar to Frazier's and undermined defendant's self-defense theory equally if not more so. Reid testified:

Q: What, if anything, did the defendant do once he got the gun back from Antonio?

A: He pointed it at [Tony].

. . . .

Q: What, if anything, did Tony Jackson do?

A: He tried to run.

Q: What do you mean he tried to run?

A: He tried to run through the bushes.

Q: Was he running in a direction towards the defendant or away from the defendant?

A: Away from the defendant.

Q: And what, if anything, did the defendant do when Tony Jackson tried to run?

A: I heard a gunshot.

. . . .

Q: In what direction were you looking when you heard this gunshot?

A: Right towards him.

. . . .

Q: And in what direction was the gun pointing?

A: Like where Tony was running to.

Because Reid's in-court testimony established the same facts contained in Frazier's out-of-court statement, the erroneous admission of Frazier's statement is of insufficient magnitude for this Court to conclude that without the error the jury would have reached a different result. Under the plain error standard, the error does not warrant a new trial.

[3] Defendant's final contention is that the trial court erred in refusing to give an instruction on accomplice testimony so that the jury would scrutinize closely Frazier's and Reid's evidence. The court granted defendant's request for an interested-witness instruction but did not give the instruction on accomplice testimony because the evidence did not support it.

A trial court must give all requested instructions supported by the evidence.

When instructing the jury, the trial court has the duty to . . . "declare and explain the law arising on the evidence." . . . Although a trial judge is not required to give requested instructions verbatim, he is required to give the requested instruction at least in substance if it is a correct statement of the law and supported by the evidence.

*State v. Corn*, 307 N.C. 79, 86, 296 S.E.2d 261, 266 (1982) (citations omitted). Where the evidence indicates that a witness was an accessory before the fact, the jury should be instructed to scrutinize the witness's testimony. *State v. Spicer*, 285 N.C. 274, 284-85, 204 S.E.2d 641, 648 (1974).

Here, however, the evidence was insufficient to support an instruction on accomplice testimony. The evidence showed that

Reid and Frazier were talking at the house when defendant and the victim asked them to go find a "dude with shades." En route to Pamlico Street, the four did not talk much. Defendant told Reid and Frazier he and the victim were looking for someone else, and defendant testified that he did not conclude that the victim was lying until they got to Pamlico Street. Thus, there is no evidence that before going or while en route to Pamlico Street, defendant plotted with Frazier and Reid to kill the victim.

Once the four stopped on Pamlico Street, Reid and Frazier remained by the car. No evidence indicates that Frazier knew defendant was going to shoot the victim. To the contrary, defendant told Frazier to tell the victim nothing would happen. Clearly, Reid was not an accomplice; the evidence shows, instead, that he pled for the victim's life.

The only evidence arguably supporting an accomplice instruction is Frazier's statements, "I shoot him. I shoot him," and "let me burn him man." However, in light of the evidence viewed as a whole, these statements do not support an instruction on accomplice testimony. There is no evidence that Frazier and defendant at any time discussed killing the victim. Further, Frazier testified:

I told [Tony] . . . , "Tell [defendant] what he want to know," like that, "so we can go."

. . . .

I told him I wasn't going to shoot him.

[I gave the gun back to Detroit] [b]ecause I ain't having nothing to do with it. And I thought it was, you know, a joke.

Given the context, Frazier's statements "I shoot him" and "let me burn him man" appear intended to convince the victim to return defendant's possessions. They would not, taken in context, sustain a charge against Frazier for being an accomplice.

In addition, the trial court instructed the jury that it "may find that some witness or witnesses are interested in the outcome of this trial. In deciding whether or not to believe such witnesses, [jurors] may take his or their interest into account." This instruction adequately informed the jury that it could give heightened scrutiny

to Reid's and Frazier's testimony. This assignment of error is overruled.

No error.